[NOT FOR PUBLICATION--NOT TO BE CITED AS PRECEDENT]
United States Court of Appeals
For the First Circuit
 No. 98-1890

 LUCY APPLEYARD,

 Plaintiff, Appellee,

 v.

 JOHN W. DOUGLASS, JR.,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Zachary R. Karol, U.S. Magistrate Judge]

 Before

Torruella, Chief Judge,

Bownes, Senior Circuit Judge,

and Lynch, Circuit Judge.

 Philip R. Olenick for appellant.

 John A. James, Jr. for appellee.

March 10, 1999

BOWNES, Senior Circuit Judge. Lucy Appleyard, a citizen
of New Hampshire, brought this action to obtain the alleged balance
due of $367,352.29 on a promissory note executed by the
J.W. Douglass Corporation (JWD) and guaranteed by defendant
J.W. Douglass, Jr., a citizen of Massachusetts. This is the second
time this case is before us. On March 6, 1998, in an unpublished
opinion, we upheld the determination of the district court that
Lucy Appleyard had standing to bring suit but remanded for a new
determination of damages. The case was tried by agreement of the
parties before a United States Magistrate Judge. The same
magistrate judge handled the remand.
 I
This opinion is concerned only with the determination of
damages on remand. We rehearse the relevant facts. Appleyard
Motor transported gasoline and other petroleum products. Its
annual revenue approximated $2.5 million. Its sole stockholder was
John Appleyard, husband of plaintiff. JWD was also in the trucking
business. In addition to gasoline and petroleum products it
transported ready mix concrete and sand and gravel. JWD's annual
revenues were approximately $20 million.
Sometime before September 16, 1988, the two corporations
entered into negotiations for the sale of Appleyard Motor's
business and assets to JWD. John Appleyard died on September 16,
1988.
Negotiations between the two companies continued after
John Appleyard's death. On November 23, 1988, Lucy Appleyard, as
the new president of Appleyard Motor, executed a purchase and sale
agreement with JWD. Under the agreement Appleyard Motor sold its
business and tangible assets to JWD for $800,000. JWD paid
$500,000 cash and gave Appleyard Motor a non-negotiable promissory
note for the balance of $300,000 payable monthly with interest at
10%. This broke down to thirty-five monthly payments in the amount
of $9,680.16 each. John W. Douglass, Jr., defendant, personally
guaranteed the note. JWD made eleven monthly payments directly to
plaintiff for a total of $106,481.76.
The purchase and sale agreement contained the following
representation: "[T]o the best of its knowledge and belief,
[Appleyard Motor] is in full compliance with all laws and
regulations which apply to the conduct of its business, including
all laws and regulations relating to employment."
JWD stopped payments on the note as of November, 1989. 
In January of 1990, JWD filed a chapter 11 bankruptcy petition. On
January 4, 1991, the Massachusetts Secretary of State involuntarily
dissolved Appleyard Motor under chapter 156, section 101 of the
Massachusetts General Laws. The complaint in this action was filed
on January 19, 1995.
 II In our first opinion we made holdings and rulings on the
damages evidence intended as a guide for the magistrate judge on
remand.
We start with the finding and ruling of the magistrate
judge that are the genesis of the damages issue. The magistrate
judge found that "AMT's [Appleyard's] drivers were driving an
excessive number of hours and that AMT must have known this. This 
constitutes a false representation or breach of warranty."
There was unrebutted testimony by Gerald Felise, vice
president and chief financial officer of JWD, along the following
lines. Felise had extensive experience in the trucking industry. 
The Department of Transportation has a long-standing requirement
mandating that truck drivers keep a record of all hours spent "on
duty" and "off duty." The time records must be kept in what is
called a log. It is the responsibility of the trucking employer to
see to it that the logs are accurate. The logs are required to be
kept at the terminal of origin and at the corporate office. After
he took over at JWD in 1989, Felise conducted an audit of the
Appleyard Motor site in Methuen, Massachusetts. He found that
although the logs kept by the truck drivers appeared to be in
compliance with Department of Transportation hour requirements,
they did not check out with the trip tickets issued at the points
of origin and delivery. Trip tickets are stamped with the time the
truck leaves the terminal and another ticket shows the time of
delivery of the load. Unlike the logs, the truckers had no control
over the times stamped on trip tickets. Appleyard Motor had a
large percentage of independent truckers hauling for it. 
Independent truckers own their own tractors and lease containers
furnished by the trucking company. It is to the financial
advantage of independent truckers to carry as many loads as
possible, which may mean working more hours than allowed by the
Department of Transportation.
Based on Felise's testimony we concluded that the finding
and ruling of the magistrate judge were neither clearly erroneous
nor legal error insofar as they involved an interpretation of
paragraph 7J of the purchase and sale agreement. This paragraph
stated:
 Seller, to the best of its knowledge and
belief, is in full compliance with all laws
and regulations which apply to the conduct of
its business, including all laws and
regulations relating to employment.

We next reviewed the relevant part of the magistrate
judge's opinion on damages. He found first:
 Upon discovering that AMT's [Appleyard
Motor's] drivers had been driving excessive
hours, Gerald Felise, Vice President and Chief
Operating officer of JWD [Douglass Corp.],
issued a directive to the drivers to bring
their hours into compliance with the law. In
order to compensate the drivers for the loss
of driving time, AMT had to raise the rates it
charged its customers. This, in turn,
resulted in a loss of customers and a $300,000
annual decline in revenue associated with the
former AMT operation.

We found no fault with this finding. It was amply
supported by the record. 
We held the findings and rulings that followed to be
clearly erroneous. The magistrate judge found and ruled:
Starting from an annual revenue base of $2.5
million, this amounts to a 12% decline. 
Although Douglas [sic] presented no evidence
that purported to address directly the issue
of damages or even to quantify JWD's loss in
profits as a result of this decline in
revenue, I infer that, if JWD had known that
annual revenue from the AMT operation would
decline 12% as a result of JWD having to bring
that operation into compliance with law, the
fair price JWD would have been willing to pay
for AMT would have been at least 12% (or
$96,000) below the $800,000 it agreed to pay. 
On this basis, I find that the difference
between the value of the assets as represented
or warranted and their actual value was at
least $96,000.

Based upon his finding of a 12% (or $96,000) offset, the
magistrate judge found that Douglass owed Lucy Appleyard "a total
of $206,270," which included interest.
In our remand opinion we concluded that there was no
evidentiary basis for the analysis and findings. We noted first
that the statement by the magistrate judge that "Douglas presented
no evidence that purported to address directly the issue of damages
or even to quantify JWD's loss in profits as a result of this
decline in revenue" was contrary to the record. Gerard Felise,
vice president and chief financial officer of JWD, testified
directly on this. His testimony can be summarized as follows.
Appleyard Motor's operations at the Methuen,
Massachusetts, site grossed $2.5 million annually. Its operating
cost was 87 cents on the dollar; this meant that its profit was 13
cents on the dollar. This translated into roughly between $200,000
and $400,000 worth of cash flow profits annually. In order to
operate in compliance with the Department of Transportation's
hourly requirements the rates charged customers were increased by
18%. The customers refused to pay the additional 18%. This
resulted in a "negative revenue stream" of $300,000, or to put it
another way, there was a $300,000 annualized decline in revenue
based on a $2.5 million starting point. This contributed to an
overall decline in revenue of 40% for JWD. The result was the
filing of a chapter 11 petition in bankruptcy by JWD on January 27,
1990. In answer to a question by the magistrate judge, Felise
stated that the $300,000 loss in annual revenue was due solely to
the mandatory compliance with the reduced hours required by the
Department of Transportation. The magistrate judge did not
question the credibility of Felise; indeed, he relied on his
testimony in finding a false representation by Appleyard Motor.
There was also testimony by Michael Pierce, accountant
for Appleyard Motor, that prior to the sale of its assets its
profits were $200,000-$300,000 a year. Thus, it appears from the
evidence that the entire profit margin of Appleyard Motor was wiped
out when the driving hours violation was corrected.
We further held that there was no evidentiary basis for
the magistrate judge's finding that if JWD had known that the
annual revenue from the Appleyard Motor operation would decline 12%
because customer rates had to be raised 18% to bring the operation
into compliance with the law, "the fair price JWD [Douglass] would
have been willing to pay for AMT [Appleyard] would have been at
least 12% (or $96,000) below the $800,000 it agreed to pay."
We pointed out that there was no testimony as to what a
willing seller would have paid a willing buyer under these
circumstances. We then stated:
Moreover, the magistrate judge gave no
consideration to the inescapable fact that a
reduction of $300,000.00 in annual earnings
effectively eliminated Appleyard Motor's
profits. We cannot conjecture without
evidence what Douglass Corp. would have paid
if the hour violations had been brought to its
attention prior to the sale. Douglass may
well have decided not to purchase Appleyard
Motor.

We further held that it was clearly established that the 
"hours violation resulted directly in an annual loss of revenue to
Douglass Corp. of $300,000," and that this violated the offset
provision in the note and purchase and sale agreement. The offset
agreement is no longer a factor in the case, however, because
defendant has expressly waived any sums due under the offset
provision. All he seeks is a ruling that he is not liable for any
further payments on the note. Footnote 1, First Opinion.
At the conclusion of our first opinion we reiterated: 

The district court clearly erred when it
inferred that Douglass Corp. would have paid
only 12% less for Appleyard Motor in the total
absence of any evidence to that effect. This
is especially so in light of the fact that
bringing Appleyard Motor into compliance with
Department of Transportation requirements
obliterated the profit margin of the purchased
entity.

 III
On remand the magistrate judge concluded 
that the evidence in the trial record is
insufficient to enable a rational factfinder
to determine with a reasonable degree of
certainty what damages defendant suffered as a
result of plaintiff's misrepresentation or
breach of warranty. Therefore, I have decided
to reopen the record to permit defendant to
present additional evidence on the subject.

Defendant declined to present any further evidence on the
ground that under the law of the case doctrine, the magistrate
judge had a duty to follow our rulings and findings and decide the
case on the evidence already addressed. The magistrate judge then
ordered the clerk
to enter judgment in favor of plaintiff, Lucy
Appleyard, in the amount of $369,288, being
the amount of principal, interest, and late
charges to which plaintiff proved she was
entitled, before any offset for damages
suffered by JWD as a result of the
misrepresentation of breach of warranty by
plaintiff's predecessor.

This was $163,018 more than the first judgment. This appeal
followed.
The magistrate judge agreed with us that there was no
evidence of what a willing buyer would have paid a willing seller
if the buyer had known that the truck driver's records had been
misrepresented to the extent of causing a reduction in Appleyard's
earnings of $300,000. Quite inexplicably the magistrate judge then
discusses at length how he arrived at the 12% ($96,000) discounted
value. 
The magistrate judge rejected our ruling that he had
erred in stating that defendant had "presented no evidence that
purported to address directly the issue of damages or even to
quantify JWD's loss in profits as a result of the decline in
review." We pointed out that Gerard Felise, vice president and
chief financial officer of JWD, testified directly on this. We
also summarized Felise's testimony.
The magistrate judge mounts a complex seven-page argument
involving fixed and variable costs rejecting the testimony of
Felise. He concludes this part of his opinion by stating, "it
cannot be said with reasonable certainty what happened to AMT's
profits as rates increased and rates declined." 
We stated in our first opinion: "Moreover, the
magistrate judge gave no consideration to the inescapable fact that
a reduction of $300,000 in annual earnings effectively eliminated
Appleyard Motor's profits." We think this clearly was binding on
the magistrate judge under the "law of the case" doctrine. The
magistrate judge thought otherwise:
 This brings me back to the very troubling
"law of the case" issue and to my reasons for
rejecting defendant's argument that the First
Circuit's decision mandates a finding that the
$300,000 decline in revenues produced by the
18% rate increase in fact wiped out AMT's
profits.

 IV
We next consider "the law of the case" doctrine as it
applies to this case. We recently held that "[f]or a bar to exist,
an issue must have been 'actually considered and decided by the
appellate court' or . . . be 'necessarily inferred from the
disposition on appeal.'" Field v. Mans, 157 F.3d 35, 40 (1st Cir.
1998); see also Commercial Union Ins. Co. v. Walbrook Ins. Co., 41
F.3d 764, 770 (1st Cir. 1994). While a future court is not bound
by non-essential dicta, it "must implement both the letter and
spirit of the mandate, taking into account the appellate court's
opinion and the circumstances it embraces." United States v.
Connell, 6 F.3d 27, 30 (1st Cir. 1993). Our conclusion in our
first opinion that Appleyard Motor's profits were "effectively
eliminated" was based on the testimony of Gerard Felise, vice
president and chief financial officer of JWD and the testimony of
the accountant for Appleyard that prior to its sale to JWD,
Appleyard Motor's profits were $200,000-$300,000 a year. The
magistrate judge did not question the credibility of either of
these witnesses. The law of the case established that all profits
were eliminated.
Given the law of the case, the undisputed evidence, and
the conclusion that the value of the business was the sum of its
equipment value and goodwill, we disagree with the magistrate's
determination that there was insufficient evidence to decide the
case. It follows that we disagree with the magistrate judge's
ruling that the record was "insufficient to enable a rational
factfinder to determine with a reasonable degree of certainty what
damages defendant suffered as a result of plaintiff's
misrepresentation or breach of warranty." Moreover, after reading
the magistrate judge's opinion carefully, we have difficulty
understanding how defendant could have proven to the magistrate
judge's satisfaction that JWD had suffered any damages by reason of
the false representation.
We, therefore, rule that it was error for the magistrate
judge to, in effect, penalize defendant for not producing
additional evidence.
This means that we reject plaintiff's argument that
defendant waived his right to proceed on the merits when he elected
not to provide additional evidence after he was invited to do so. 
The magistrate judge did not in fact rule that defendant had waived
his claim. After summarizing the reasons why he could not decide
the damages without additional evidence, he stated:
 Accordingly, for the reasons stated in the
Decision on Remand, and in light of
defendant's decision not to present additional
evidence regarding damages, the clerk is
hereby ORDERED to enter judgment in favor of
plaintiff, Lucy Appleyard, in the amount of
$369,288, being the amount of principal,
interest, and late charges to which plaintiff
proved she was entitled, before any offset for
damages suffered by JWD as a result of the
misrepresentation or breach of warranty by
plaintiff's predecessor.

Because of the magistrate judge's refusal to follow our
clear holdings and rulings, we rule that defendant had the right to
appeal the judgment of the magistrate judge and proceed on the
record before the court.
The final issue is: in light of our rulings and findings
on the applicability of the "law of the case" doctrine, how should
we proceed. We are reluctant to remand the case again to another
judge for another determination of damages. There are certain
circumstances where remand can be dispensed with, such as where the
record permits only one rational answer or where repeated efforts
at factfinding have resulted in confused or unsupportable findings. 
See, e.g., Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 72 F.3d
190, 198 (1st Cir. 1995) (in lieu of remand, sorting through record
to distinguish findings as to which deference is due and tainted
findings as to which deference is not owed); Williams v. Poulos, 11
F.3d 271, 280 (1st Cir. 1993) (describing conditions under which
"court of appeals [itself] can, and often should," fix an error). 
This is such a situation. There is evidence in the record
sufficiently clear and uncontested to allow us to make the
necessary findings to terminate the case at the appellate level.
The following facts are uncontroverted. Appleyard Motor
and JWD executed a purchase and sale agreement on November 23,
1988. Under its terms JWD purchased the business and tangible
assets of Appleyard for $800,000. Five hundred thousand dollars of
the purchase price was paid in cash. The balance of $300,000 was
to be made in thirty-five monthly payments. A total of $106,481.76
was paid on the note. JWD had paid a total of $606,481.76 to
Appleyard before it stopped payments on the note as of November
1989. In January of 1990 JWD filed a chapter 11 bankruptcy
petition.
The magistrate judge found in his first opinion, based
upon the testimony of Gerard Felise, that the false representation 
"resulted in a loss of customers and a $300,000 annual decline in
revenue associated with the former AMT operation." See infra at 5. 
This finding was clearly correct. The evidence is that Felise took
over the operation of both companies in 1989. 
We make the following rulings: Because of the raise in
rates put into effect by Felise, JWD received $300,000 less in
revenue from its Appleyard operation. This was due to the fact
that when the rates were raised in 1989 to meet federal work-hour
requirements, Appleyard lost customers. Appleyard's annual profits
had ranged between $200,000 to $300,000 a year. After the rates
had been raised but rejected by its customer, Appleyard could no
longer operate at a profit. After JWD filed for bankruptcy in
January of 1990, Appleyard also ceased to exist as an operating
business. The false representation by Appleyard caused the demise
of both businesses.
Based on these undisputed facts, we conclude that
defendant has no obligation to make any further payments to
plaintiff. Defendant has expressly waived any sums that might be
due under the offset provision of the purchase and sale agreement. 
This means, of course, that he cannot attempt to collect any money
that might theoretically be due from plaintiff either individually 
or as a former officer of Appleyard Motors.
The judgment below is reversed and remanded with
directions to the district court to enter judgment in favor of
defendant, John W. Douglass, Jr.
No costs to either party on appeal.